1819.

SEARLE
v.
SCOVELL.

### SEARLE & ADAMS *against* SCOVELL.

> Where a ship puts into an intermediate port, in distress, and is con-
> demned as unseaworthy; and it becomes necessary, for the trans-
> portation of the cargo saved to its destined port, to hire another
> ship, the cargo, on its arrival at the port of destination, is chargea-
> ble with the *increase* of freight arising from the charter of the new
> ship :  *That is,* the *extra* freight beyond what the freight would have
> been under the original charter-party, if the necessity of hiring ano-
> ther ship had not intervened.   The owner of the goods is not re-
> sponsible both for the old and new freight.
> To ascertain such *extra* freight, the proper rule seems to be, to deter-
> mine the difference between the amount of the freight under the
> original charter-party, and the *rateable freight,* for the goods saved
> to the port of necessity, added to the freight of the new ship hired to
> carry on the goods.

*Dec.* 3*d* and
21*st.*

    BILL for an injunction, filed *June* 14, 1819.   The plain-
tiff, *Caleb Adams,* master of the ship *Middlesex,* which had
been chartered by *R. Pettit,* of *London,* while sailing on the
voyage, with a cargo of goods on board, from *London,* bound
to *New-York,* was obliged to put into *Fayal,* in distress, where

the ship was condemned as unseaworthy, and sold for the benefit of all concerned.   Part of the cargo had been thrown overboard on the passage from *London* to *Fayal*, and a part, being damaged, was sold at *Fayal*, to defray the necessary expenses there.   The plaintiff *A.*, in order to procure the transportation of the residue of the cargo, in his possession, to *New-York*, as master, acting for the benefit of all concerned, according to his best judgment, and the advice of the *American* consul at *Fayal*, on the 29th of *March*, 1819, entered into a charter-party with *James Searle & Co.* agents of the plaintiff *S.*, owner of the ship *Enterprize*, by which he hired so much of the tonnage of the ship *E.*, as was sufficient to stow the residue of the cargo of the *Middlesex*, to be carried to *New-York*, and for the transportation of which he engaged to pay two thousand dollars freight, on the delivery of the goods at *New-York*.   The master of the *Enterprize* signed a bill of lading, in the usual form, for the goods, to be delivered at *New-York* to *A.* or his assigns, he paying freight, 2,000 dollars, as per charter-party.   A part only of the goods so re-shipped belonged to *R. P.* of *London*, and were consigned to the defendant; the remainder of his goods had been thrown overboard, or sold as damaged : the residue of the cargo of the *Middlesex* belonged to different persons, who were general shippers in the *Middlesex*.   The *Enterprize* arrived at *New-York* on the 17th of *May*, 1819, when an adjustment of the freight of the cargo from *Fayal* to *New-York*, was made by an insurance broker, so as to charge the owners of the several parcels of the goods, with a rateable proportion of the 2,000 dollars.   Upon this adjustment, the freight of the goods belonging to *R. P.*, consigned to the defendant, was charged with 1,338 dollars and 19 cents.   Each owner and consignee of the goods entered their respective parcels at the custom house, and paid their proportions of the freight from *Fayal*, agreeably to the adjustment, except the defendant, as consignee of the part belonging to *R. P.*   The plaintiff *A.* offered to deliver the

1819.

SEARLE
v.
SCOVELL.

1819.

SEARLE
v.
SCOVELL.

goods belonging to *R. P.* to the defendant, as consignee, on his paying the amount of freight charged, according to the adjustment; but the defendant refused to accept the goods, and pay the freight.   To protect the *lien* of the plaintiff *S.* on the goods for the freight, *A.* offered to enter the goods at the custom house, as consignee, under the bill of lading; but the collector, *D. G.*, refused to allow such an entry to be made.

The bill also charged, that the defendant omitted to enter the goods, in order to defeat the lien of the plaintiff *S.*, and that on the 4th of *June*, 1819, the goods were taken from the ship and possession of the plaintiffs, by order of the collector, and deposited in the public store, agreeably to law.   On the 5th of *June*, the defendant was allowed to enter the goods, and thus obtained possession of them, with a view to defeat the *lien* of *S.*, the plaintiff, for the freight.   That the plaintiff *A.*, having become personally responsible to the plaintiff *S.* for the freight of the goods belonging to *R. P.*, by the charter-party entered into at *Fayal*, shipped the goods in his own name, consigned to himself, for his own indemnity.   The bill further charged, that by the delivery of the goods to the defendant, the plaintiff *A.* had lost all security for such indemnity, except the personal responsibility of the defendant.   The bill prayed for an injunction to restrain the defendant from selling and disposing of the goods so received by him from the public store, until the freight was paid; and that the defendant may be compelled to pay such freight to the plaintiff *S.*, or deliver over the goods to him, &c.   An injunction was accordingly issued.

The defendant put in his answer, on the 28th of *July*, admitting the material facts stated in the bill; but denying that the plaintiff *A.* had power, by any acts at *Fayal*, to bind *R. P.*, or the defendant, or the goods, for the freight of the *Enterprize.*   The defendant insisted that he could not be subject to a greater freight than what was provided for in the first bill of lading.   He stated, that acting merely as agent, he

did not consider himself authorized to pay the freight demanded, without the judgment of a competent Court. He denied any improper views or intention to defraud the plaintiff S. of the freight; and averred his ability to pay the freight and costs, if so directed; and that he had offered security to pay the freight, if required, which had been refused, &c.

A motion was now made to dissolve the injunction.

*Griffin* and *T. A. Emmet*, for the defendant, in support of the motion, contended, on the ground stated in the answer, that the master had no power to bind the *cargo* for the freight from *Fayal*, under the new charter-party of the ship *Enterprize*. They cited 2 *Campb. N. P. Rep.* 42. 10 *East*, 378. 4 *Rob. Adm. Rep.* 236. 2 *Starkie's N. P. Rep.* 1. *Marsh. on Ins.* 541.

*Boyd, contra*, contended, that the master, at *Fayal*, became the agent of the owners of the cargo, from necessity, and had a right to bind the cargo for the new freight, for the transportation of it to *New-York*, on the same principle that he had a right to hypothecate or sell a part of the cargo, for repairs of the ship, and to enable him to prosecute the voyage. He cited 3 *Rob. Adm. Rep.* 240. *The Gratitudine*, 1 *Johns. Rep.* 115. *Laws of Oleron*, art. 4. *Laws of Wisbuy*, art. 16. *Ord. d'Amsterdam*, art. 3. *Ord. Rotterdam*, art. 147. *Molloy, J. Marit.* b. 2. c. 4. s. 5. 2 *Burr. Rep.* 882. 1 *Term Rep.* 611. note. *Doug.* 222. 231. 9 *Johns. Rep.* 21. 2 *Camp. N. P. Rep.* 623. *Marsh. on Ins.* 378. 500. 1 *Emerig. des Ass.* 428. 9 *Mass. Rep.* 548. 10 *Mass. Rep.* 192. 5 *Johns. Rep.* 262.

The cause stood over for consideration to this day.

THE CHANCELLOR. The material charges in the bill are not denied in the answer, but the motion for dissolving the

*Dec. 3d.*

*Dec. 21st.*

injunction is founded upon the doctrine set up in the answer, that the master of the ship *Middlesex* had no power, while at *Fayal*, to bind the goods, or the owner of them, for the *extra* freight arising from the hire of the ship *Enterprise*.

We are, upon this motion, to take, as true, the charges in the bill, that the ship *Middlesex* put into *Fayal* in distress; that part of the cargo was lost by the perils of the sea; that the ship was properly condemned as unseaworthy; that it became necessary for the purpose of conveying the cargo that was saved, to *New-York*, to charter the ship *Enterprise*, and that the captain acted with good faith, and to the best of his judgment, throughout the transaction.

Under these circumstances, I take the rule of law to be, that the cargo brought to *New-York* was chargeable with the increase of the freight arising from the charter of the new ship. Whether the amount of freight, according to that rule, and under the complicated circumstances of this case, has been correctly ascertained, is not now the question. The important point now in dispute is, whether the owner of the cargo delivered at *New-York*, is bound to pay the original freight only, or whether the plaintiffs are entitled to demand, in lieu of it, the new freight contracted for at *Fayal*. The plaintiffs, in ther bill, claim only the new freight from *Fayal* to *New-York*, according to the adjustment; and the defendant, in his answer, seems to admit that the original freight, as contracted for by the charter-party at *London*, was due, and *that* freight he has offered to pay.

*It is the duty of the master, when his vessel is disabled in the course of the voyage, to procure another, if he can, to take on the cargo.*

*He is, in such case, from necessity, the agent of the owner of the cargo; and his acts, in relation to the cargo, are binding upon it.*

It is understood to be the duty of the master, when his vessel is disabled in the course of the voyage, to procure another, if he can, and take on the cargo. (*Emerigon*, tom. 1. 427, 428. *Wilson* v. *The Royal Exchange Insurance Company*, 2 *Campbell's Nisi Prius*, 623. *Scheffelin* v. *The New-York Insurance Company*, 9 *Johns. Rep.* 21.) This duty arises from the character of agent for the owner of the cargo, which is cast upon him from the necessity of the case; and in that character he is bound to act for the

best interest of all concerned. His acts, in the execution of such a trust, and in relation to the property under his care, ought to be valid and binding upon the property, except in cases where his power is limited by positive rules.

*Emerigon*, (tom. 1. 429 to 433.) lays down this doctrine, and declares that if the ship be forced by necessity into a foreign port, the captain becomes the agent of the owners of the cargo, as well as of the ship, and he is bound to see to the preservation of the cargo, and to do whatever the circumstances of the case shall dictate to be for the best, and what it is to be presumed the owners would do, if they were present. His character of master invests him with the care and responsibility of a general agent of the ship and cargo; and he would be very blameable, continues *Emerigon*, if he left the cargo at a foreign port, while he had it in his power to carry it by another vessel to the port of destination.

These general principles, in respect to the power and duty of the master, in a case of extremity, have been repeatedly recognized in the *English* Courts.

In *Miller* v. *Fletcher*, (*Doug.* 231.) Lord *Mansfield* said, that the captain, at an intermediate port into which he was forced by necessity, had an implied authority to do what was right and fit to be done, as if it were his own ship and cargo; and this general discretion arising from the necessity of his situation, was again laid down as sound doctrine, by the King's Bench, in *Plantamour* v. *Staples*, (1 *Term Rep.* 511. note.) But the power of the master over the cargo, in situations of distress, was much more fully discussed in the case of *The Gratitudine*, (3 *Rob. Adm.* 240.) and the principles which were there brought forward, are so clearly illustrated, and so powerfully enforced, that they can scarcely fail to command universal conviction.

The language of that case is, that considering the peculiar

situation in which a master is placed, in times of danger, and his known power over the cargo in other analogous cases, such as *Jettison* and *Ransom,* it would seem to follow, as an essential provision of the system of maritime law, that he should have a power and authority over the cargo adequate to the purpose of discharging his trust, and providing for the safe delivery of it at the port of destination. The opportunity of abuse exists equally in the cases of acknowledged power, and cannot impeach the soundness or utility of the general principle. And though, in the ordinary state of things, the master is a stranger to the cargo beyond the purposes of safe custody and conveyance, yet in cases of instant, and unforeseen, and unprovided for necessity, the character of agent and supercargo is forced upon him by the general policy of the law. It is not to be supposed the law intended that valuable property in his hands should be left without protection and care; and he must, in cases of emergency, exercise the discretion of an authorized agent. The cargo is not to be left at the port of necessity to perish for want of care. The master must exercise his judgment, whether it would be better to tranship the cargo, if he has the means, or to let it remain. He may bind the cargo, for repairs to the ship. He may sell part of the cargo for the puspose of applying the proceeds to the prosecution of the voyage, or he may hypothecate the whole for the same purpose. If he sells, the law does not fix any aliquot part, though it must be of a part only; and generally speaking, it must be adequate to the occasion. What is reasonable and just, in respect to the execution of his powers in such cases, is legal.

Upon the doctrine of these decisions, (and which has received the sanction of the Supreme Court, 9 *Johns. Rep.* 29.) there can be no doubt of the authority of the master, in a case of necessity, to hire another ship at the foreign port, and in the character of agent, to charge the cargo with the *extra* freight of such renewed voyage. The necessity of

this power becomes the more apparent, if it is now to be considered as settled, (*Van Omeron v. Dowick*, 2 *Campb. Nisi Prius*, 42. *Wilson v. Millar*, 2 *Starkie's Nisi Prius Rep.* 1.) that the master cannot put an end to the adventure by selling the cargo at the foreign port, without any view to a further prosecution of a voyage, even though such a sale would be the most beneficial course for the owner.

The power of the master to hire another vessel for the completion of the voyage, and to charge the cargo with the increased freight, is not only to be deduced from general principles of maritime law, but it is a power explicitly recognised and admitted in the books.

*Emerigon (ubi supra)* raises and discusses the question, at whose expense the new ship is to be hired. He is of opinion that the captain ought to have his election, either to take the entire freight first agreed, and assume upon himself the freight of the new ship, or to charge only a rateable freight for the proportion of the voyage performed in the first ship, and to let the freight of the substituted ship be at the charge of the cargo saved and transported. It is much better, he says, that it should be considered *the duty* of the master to hire another ship, and that the charge of the increased freight should be at the expense of the cargo, than that it should be left to his own volition whether or not he would hire another ship at his own expense, and complete the voyage.

*Valin* and *Emerigon* did not agree in their construction of the ordinance of the marine, upon this subject. According to the former, (tit. *Du Fret*, art. 11. tom. 1. p. 653.) the master is not obliged to hire another vessel to take on the cargo, and is only to do so, if he means to earn and demand his entire freight, instead of remaining contented, at the interruption of the voyage, with his *pro rata* freight; and if he hires another vessel, he does it at his own expense, though the hiring should exceed the freight which remained to be earned by the first ship. But *Valin* admits, (and the con-

1819.

SEARLE
v.
SCOVELL.

Where the master, in case of necessity, hires another ship to carry on the cargo, the extra freight for the renewed voyage, is a lien on the cargo.
The master has no right to sell the cargo at the port of necessity, and then put an end to the adventure, if he can hire another vessel to carry the cargo to its destined port.

1819.

SEARLE
v.
SCOVELL.

cession is decisive on the point,) that if the hiring of another ship was a duty, and not a mere voluntary act on the part of the master, the excess of freight beyond the original amount agreed on (*pour l'excedent du fret convenu d'abord entr'eux et le maitre*) would be at the expense of the owner of the cargo.

The royal declaration of *August*, 1779, charges the insurer of the cargo with the *extra* freight in such cases; (*surcroit de fret, s'il y en a ;*) and this, in the opinion of *Emerigon*, gives the true spirit of the ordinance of 1681. The *French Code de Commerce*, No. 391. 393. adopts the regulations of the ordinances of 1681 and 1779, and declares, that if the ship becomes unfit for sea, the master is bound to use his best endeavours to procure another ship, and the insurer on the cargo is bound for the charges of unloading, storing, re-shipment, and *extra* freight. (*De l'excedent du fret.*) In addition to the weight justly due to these foreign writers and ordinances, on a question of marine law, we have an express decision upon the point, in the case of *Mumford* v. *The Commercial Insurance Company*, (*5 Johns. Rep.* 262.) It was there held, that the insurer upon the goods must pay the increased freight arising from the necessary change of the ship. This decision settles the law here, and shows that the claim of the plaintiffs to a *lien* on the goods for the freight from *Fayal*, was well founded. If the cargo was chargeable, under the contract of the master, with this new freight, there can be no doubt that the plaintiffs were entitled to retain possession of the goods until the freight was paid.

It might require some consideration, before the master, to settle the amount of freight which is to be paid in these cases of a change of ship; but the parties before me seem to agree that the only point in dispute between them is, whether the original or the new freight should be demanded and paid. I understand from the *French* books, that the *extra* freight means the surplus beyond what the freight would have been

by the original charter-party, if no necessity of hiring another ship had intervened. The owner of the goods is not responsible for the old and the new freight united. The first ship did not earn, upon any principle, more than a rateable proportion of the original freight, because she performed only a part of the voyage; and it might well happen, if the freight up to the port of necessity was accurately and justly apportioned, that the hire of the new ship might not amount to more than the portion of the original freight which *remained* to be earned by the first ship. The maritime law of *France* gives a rateable freight, in all cases of a loss of voyage by *vis major*, for the goods brought to an intermediate port; and, therefore, the ordinances contemplate the case of a re-shipment without any excess of freight beyond the original contract. (*Surcroit de fret, s'il y en a.*) In the present case, only part of the cargo was preserved and brought to its place of delivery, and therefore freight was due only for the goods that were brought, because, unless there be a very special and precise agreement to the contrary, freight is only due under the original contract, in proportion to the amount of the goods delivered. (*Abbot*, p. 244. *Pothier*, tit. *charte-partie*, n. 67, 68. *Frith* v. *Barker*, 2 *Johns. Rep.* 327.) To ascertain the amount of the *extra* freight in this case, upon the principles of the *French* law, I apprehend we ought to see what would be the difference between the amount of the freight under the original charter-party, for the portion of the cargo delivered at *New-York*, and the amount of a rateable freight to *Fayal*, for the goods saved, added to the freight of the new ship. That difference being in this case much greater than the original freight which would have been to be paid, if the first ship had been able to come on, would show the excess of freight incurred in this case by the defendants, as owners of the cargo. But any attempt at an estimate of this kind becomes unnecessary, because the original contract is considered as dissolved, and all claim for freight under it is abandoned by

the plaintiffs. They claim only the new freight from *Fayal* to *New-York*, and the defendant is willing to pay, under the original contract, as though there had been no change of the ship.

The motion to dissolve the injunction must accordingly be denied, except upon the condition of bringing into Court the freight charged in the bill, with interest thereon from the time the plaintiffs were dispossessed of the goods.

*Order accordingly.*